*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellant,

v

PAUL LAMOUNT GOREE,

        Defendant-Appellee.

UNPUBLISHED
September 22, 2022

No. 357302
Wayne Circuit Court
LC No. 18-009718-01-FH

Before: M. J. KELLY, P.J., and MURRAY and BORRELLO, JJ.

MURRAY, J., (*concurring*).

I fully concur in the majority opinion but write separately to address an issue not raised by the parties but acknowledged by them: the numerous difficulties experienced during the suppression hearing that was conducted remotely.

The suppression hearing was conducted over two days, March 12 and April 14, 2021. The hearing was conducted remotely, presumably because of the pandemic and AO 2020-17. As both appellate counsel conceded at oral argument before this Court, the hearing was filled with technical and related difficulties that would not have been present had this been an in-person evidentiary hearing. For example, there were 17 requests for a participant to "unmute" their audio function, and six times when a video camera was either turned off or frozen. Two incidents were more significant than the others. At one point during the proceedings, the court had to instruct defendant to turn on his video. Once he did so, it was clear he was at work (he admitted as much), and his counsel had to instruct him to stop walking around while the proceeding was ongoing. On another occasion, when the trial court was stating its ruling on the record, defense counsel "dropped" from the proceeding, resulting in his missing a portion of the ruling and having to ask the court to repeat itself. Additionally, defendant spoke out of turn at least 15 times,[1] had to be told to turn on his

---

[1] The outbursts included (amongst others) defendant making statements during Officer Esposito's testimony, interjecting during arguments on objections from counsel, and interposing his views on matters while the proceedings were ongoing. Outbursts can also occur in a courtroom, but a court has more control over the participants when they are present before the court (and its bailiffs).

video twice, and was asked by the prosecutor to stop yelling at someone (though the audio was off). Though these incidents were not the fault of the trial court or counsel, they exemplify why, post-pandemic, evidentiary hearings (and trials) need to be conducted in the courtrooms across this state.

As many courts have recently acknowledged, the use of video conferencing technology like that offered by Zoom Technologies Inc or Microsoft Corporation (the "Teams" platform) during the pandemic allowed courts to continue performing many of their constitutional duties. See AO 2020-08, 507 Mich xci, cvii ("Video court served its purpose during the state of emergency, but this emergency has, for the most part, passed.")(ZAHRA, J., *dissenting*); *In re RD*, 2021 Ill App (1st) 201411; __ NE3d __ (2021), at *3 ("Significantly, Zoom was used to conduct these hearings only because Illinois was in the grips of the COVID-19 pandemic and, at the time, a vaccine was not available. Given the extraordinary challenges presented by the pandemic, Zoom hearings enabled courts to conduct business while keeping people safe from a deadly virus that spreads easily through in-person interactions."). For example, thanks to our spectacular staff at the Court of Appeals, this Court barely missed a beat in transitioning to remote oral arguments, allowing the Court to continue with oral arguments while keeping up on our case load, and in fact significantly reducing our backlog.[2]

But it is equally true that despite the great flexibility these technologies provided to courts to continue many operations during the pandemic, the benefits lost by not having the parties and witnesses appear in an actual courtroom were significant. See e.g., *My Own Meals Inc v PurFoods, LLC*, __ F Supp 3d __, __ (ND Ill, 2022); slip op at 5 ("And while Zoom and Teams got the legal world through the toughest times of the pandemic, it was not without glitches and tribulations— and never was intended to supplant basic constitutional considerations or requirements—or even preferences about live proceedings."). And now that our state is essentially back to our normal manner of living, it is important to recognize the need to return to the courtroom to conduct matters such as an evidentiary hearing on a motion to suppress.

There is little doubt that remote technology will still be an efficient means for conducting many routine matters like status conferences, routine traffic tickets, and other more minor matters that do not require the introduction of evidence or significant interchange on the merits between judge and counsel. From the litigant and attorney perspective, it's simply not economical to expend the additional time and resources to go to court for these types of routine matters, and the technologies allow those matters (should the trial court and parties agree) to be successfully done remotely. But when it comes to evidentiary matters, "[r]emote proceedings, despite the greatly improved and available technologies, simply do not compare to face-to-face interaction." *People v Anderson*, __ Mich App __, __; __ NW2d __ (2022) (Docket No. 354860); slip op at 7. As one judge stated, " 'live testimony [remains] markedly preferable to remote testimony.' " *Roh v Schultz*, unpublished opinion of the US District Court for the District of Columbia, issued June 14,

---

[2] For obvious reasons, it was much easier for appellate courts to remotely conduct business than it was for trial courts.

2022, at \*6, quoting *Federal Trade Commission v Illumina, Inc*, unpublished opinion of the US District Court for the District of Columbia, issued April 20, 2021, at \*3. [3]

In his concurrence in *Vazquez Diaz v Commonwealth*, 487 Mass 336, 357; 167 NE3d 822 (2021) (Kafker, J., concurring), Massachusetts Supreme Judicial Council Associate Justice Scott Kafker aptly summarized the resulting deficiencies from remote hearings:

> During the COVID-19 pandemic, the judicial system has been required to rely on virtual proceedings to continue to function effectively. In particular, the judicial system has placed heavy reliance on video conferencing technology, such as that of Zoom Video Communications, Inc. (Zoom). We have also discovered the advantages of virtual proceedings in certain important respects, particularly in terms of safety and convenience. That being said, a virtual evidentiary hearing on Zoom, or similar technologies, is not the same as an in-person evidentiary proceeding. The evolving empirical evidence indicates a virtual hearing may alter our evaluation of demeanor evidence, diminish the solemnity of the legal process, and affect our ability to use emotional intelligence, thereby subtly influencing our assessment of other participants.

Aside from the detrimental impacts remote proceedings have on credibility assessments, interruptions to the proceedings, etc., remote proceedings also have a significant impact on the solemnity of the proceedings, i.e., how the parties respect the proceedings and the overall seriousness given to the matter before the court. Our Court has repeatedly emphasized this point, see *Anderson*, __ Mich App at __, slip op at 7, and *People v Heller*, 316 Mich App 314, 318; 891 NW2d 541 (2016), as have Justices VIVIANO and BERNSTEIN:

> The overemphasis on remote hearings reflected in today's court rule amendments risks—in a very real way—depriving people of their day in court. Even prior to the COVID-19 pandemic, research revealed concerns about the impacts caused by holding proceedings remotely. Remote proceedings may 'make it more difficult for the judge to both embody and maintain the authority of the court,' and appearance via video may not 'adequately convey the authority of the

---

[3] As the *Illumina* court recognized, "the utility of live proceedings is not limited to aiding in the evaluation of witness credibility—though that is one important benefit, see *Beall v Edwards Lifesciences LLC*, 310 F Supp 3d 97, 106 (D DC, 2018); *Pyrocap Int'l Corp v Ford Motor Co*, 259 F Supp 2d 92, 98 (D DC, 2003). Among other advantages, live proceedings permit more natural dialogue among hearing participants, allow participants to handle any physical evidence, and avoid the technical difficulties that can sometimes trip up virtual proceedings." *Illumina*, __ F Supp at __; slip op at \*3. In my view, remote proceedings do not work nearly as well for certain non-evidentiary matters, such as arguments on dispositive motions or appellate arguments, since despite the wonderful technological advances, nothing compares to the in-person exchange between counsel and the court. It is the superior way to conduct meaningful arguments. But because the issue here arose from an evidentiary hearing, that will be the focus.

court,' which can affect the solemnity of the proceedings. Well-settled caselaw holds that, in the context of criminal trials, in-person testimony can be essential to a defendant's constitutional rights. Even commentators who support expansion of videoconferencing technologies in judicial proceedings advise proceeding with caution before adopting radical changes that risk impinging on litigants' rights and access to justice more broadly. Indeed, the benefits of remote proceedings are often more apparent than their costs, but there is a risk that judges and judicial policymakers may 'face pressure to overemphasize values such as speed, cost savings, and reduced workloads at the cost of fair proceedings.' [AO 2020-08 at cx-cxii (VIVIANO and BERNSTEIN, JJ., concurring in part and dissenting in part) (footnotes omitted)]

Justice Kafker recognized this point as well, highlighting how remote proceedings detract from the dignity of the proceedings:

When a person physically comes to court, he or she is immediately aware of the gravity of proceedings felt in an actual court room. The transition to a virtual court room is different. There, the participants experience court in the same way in which they experience much of their everyday life, usually from the same location in which they live, work, or socialize –- or, as in this case, from the jail in which the defendant is held in custody. See *Poulin*, Criminal Justice and Videoconferencing Technology: The Remote Defendant, 78 Tul L Rev 1089, 1134-1135 (2004). Seeing other participants on screen in similar environments both deemphasizes the formal nature of court and diminishes the sense that they are engaging in a unified proceeding. See Bandes & Feigenson, Virtual Trials: Necessity, Invention, and the Evolution of the Courtroom, 68 Buff L Rev 1275, 1322-1323 (2020). While this has often been necessary during the COVID-19 pandemic, judges must be conscious that when so many communications take place through video conferencing, court proceedings risk becoming just another video call, rather than an occasion the solemnity of which is reinforced by the environment in which it takes place. [*Diaz*, 487 Mass at 363-364 (KAFKER, J., concurring).]

The suppression hearing highlights the problems, noted above, that are inherent in remote proceedings. Given our recent experience at the Court of Appeals, where the vast majority of counsel appear for arguments, it's reasonable to assume that virtually (no pun intended) all evidentiary hearings and trials will be held in courtrooms, as is being done today in most circuit courts. Absent a set-back with the current situation—or, God forbid, a new pandemic—I trust that the lawyers and judges of our great state will take care of business on these types of matters where they must—the courtroom.

/s/ Christopher M. Murray